**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge William J. Martínez**

Civil Action No.  10-cv-02216-WJM-KLM

STROH RANCH DEVELOPMENT, LLC, a Colorado limited liability company,

      Plaintiff,

v.

(1) CHERRY CREEK SOUTH METROPOLITAN DISTRICT NO. 2,
(2) CHERRY CREEK SOUTH METROPOLITAN DISTRICT NO. 3,
(3) CHERRY CREEK SOUTH METROPOLITAN DISTRICT NO. 4,
(4) CHERRY CREEK SOUTH METROPOLITAN DISTRICT NO. 5,
(5) CHERRY CREEK SOUTH METROPOLITAN DISTRICT NO. 6,
(6) CHERRY CREEK SOUTH METROPOLITAN DISTRICT NO. 7,
(7) CHERRY CREEK SOUTH METROPOLITAN DISTRICT NO. 8,
(8) CHERRY CREEK SOUTH METROPOLITAN DISTRICT NO. 9,
(9) CHERRY CREEK SOUTH METROPOLITAN DISTRICT NO. 10,
(10) CHERRY CREEK SOUTH METROPOLITAN DISTRICT NO. 11,
(11) THE PIVOTAL GROUP, INC.,
(12) PIVOTAL PARKER INVESTMENTS, LLC, a Delaware limited liability company a/k/a
(13) PARKER INVESTMENTS 2009, LLC,
(14) PIVOTAL COLORADO II, LLC,
(15) NORTH PARKER INVESTMENTS, LLC,
(16) KURT WOLTER,
(17) KIMBERLY JENSEN,
(18) GREG MCILVAIN,
(19) MARK EAMES,
(20) GREG EPP,
(21) BILLY HARRIS, and
(22) JOHN DOES 1 through 8,

      Defendants.

---

**ORDER DENYING JOINT MOTION FOR SUMMARY JUDGEMENT  ECF NO. 165**

---

      This matter is before the Court on the Defendant Cherry Creek South

Metropolitan District No. 2's *et al.* ("Defendants") Joint Motion for Summary Judgment

("Motion").  (ECF No. 165.)  Plaintiff Stroh Ranch Development, LLC ("Plaintiff" or

"SRD") has filed a Response,  (ECF No. 184) and Defendants have filed a Reply.  (ECF 196.)   At the Court's request, the parties filed Schematics and Chronologies outlining the contract and equitable claims.  (ECF Nos. 217-218 and ECF Nos. 219-222.)  The Plaintiff's Schematic is illustrative and appended to this Order as Schedule A.  In addition to these materials, the parties filed supplemental briefing for Oral Argument that was heard on February 25, 2013.  (ECF Nos. 226-227.)

Having reviewed and considered the extensive written and oral arguments made by the parties, the Court denies Defendants' Motion for Summary Judgment.  Denial of summary judgment is ordered only to the extent that it applies to the interpretation of the Reimbursement Agreements, and to the related issue of the implied covenant of good faith and fair dealing.   The Court holds that extrinsic evidence is required to inform and discern the intent and reasonable expectations of the parties with respect to the Reimbursement Agreements.  (ECF No. 165.)  The Court makes no findings with respect to the Reserved Powers Doctrine; nor on the issues related to notice and breach of contract.

## I. INTRODUCTION

The case is complex because of its multiple contract, equitable and constitutional claims.  Due to the private/public divide in which the claims are set, the case presents questions of first impression in the District of Colorado.  This context has been well-documented.  *See Janice G. Local Government Contracts: Escaping from the Governmental/Proprietary Maze*, 75 Iowa L.Rev. 277, 290–299 (1990).

Notwithstanding this, what lies at the core of this dispute is reimbursement monies—*i.e.* an advance made by Plaintiff to the Defendant Districts between 1985 through 2004.  The purpose of that advance was to provide funding for public works on public land.  The advance made by Plaintiff to Defendants amounts to $3,507,817. (ECF No. 165-15 at 6).  The advance was initially owed by District 2, which was subsequently divided into Districts 3-11.  (ECF No. 165-15 at 6).  The amount owing with respect to each District, including District 2, is accounted for in the Reimbursement Agreements.  (ECF No. 165-15.)  Schedule A of this Order is illustrative.

To resolve the instant Motion, a central issue involves interpretation of the Reimbursement Agreements.  The battle lines drawn over interpretation are primarily directed at the Discretionary Clause (Section 1) and Covenant Clause (Section 4), respectively.  (ECF No. 165-15 at 2.)  The parties have competing interpretations of how these clauses should be construed.  Based on Defendants' position, many of Plaintiff's contract claims 'rise and fall' on whether these clauses can be construed as a matter of law based on Defendants' preferred position.  Resolving the interpretation issue effectively resolves Defendants' Motion.  It is for this reason why the Court addresses this issue, coupled with related issue of good faith and fair dealing.[1]

---

[1] The Court notes that a twelve day jury trial is set for September 23, 2013.  (ECF No. 200.)  In light of this Order, and among other issues, extrinsic evidence will ultimately be assessed by the jury for interpretation purposes.

## II. STANDARD OF REVIEW

### A.    Summary Judgement in the Context of Contract Interpretation

Summary judgment is warranted under Rule 56(a) of the Federal Rules of Civil Procedure when "the movant shows that there is no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986).  A fact is "material" if under the relevant substantive law it is essential to proper disposition of the claim. *Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231-32 (10th Cir. 2001).   An issue is "genuine" if the facts are such that they might lead a reasonable jury to return a verdict for the nonmoving party. *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997).  A court must resolve factual ambiguities in favor of the nonmoving party, thus favoring the right to a trial. *Houston v. Nat'l Gen. Ins. Co.*, 817 F.2d 83, 85 (10th Cir. 1987); *Bausman v. Interstate Brands Corp.*, 252 F.3d 1111, 1115 (10th Cir. 2001)

In a contract case, a motion for summary judgment allows for contract interpretation as a matter of law. *Lake Durango Water Co., Inc. v. Pub. Utils. Comm'n*, 67 P.3d 12, 20 (Colo. 2003).  If, however, a contract is determined to be ambiguous, as here, the meaning of its terms are generally an issue of fact to be determined in the "same manner" as other factual disputes. *East Ridge of Fort Collins, LLC v. Larimer and Weld Irr. Co.*, 109 P.3d 969, 974 (Colo. 2005);  *Dorman v. Petrol Aspen, Inc.*, 914 P.2d 909, 912 (Colo. 1996).   As such, and before a moving party can attack a contract claim on summary judgment, the moving party must first show that the contract is unambiguous and can be construed as a matter of law.  If not, interpretation becomes a question of fact requiring extrinsic evidence to clarify the meaning of the contract. *Id.*

4

Once the matter raises a "genuine issue" of fact, this effectively defeats a motion for summary judgment.  That is precisely the outcome here as extrinsic evidence is required in this case to dispose of the interpretation and the good faith issues.  *See Milk 'N' More, Inc. v. Beavert*, 963 F.2d 1342, 1345-6 (10th Cir. 1992); *Malasky v. Dirt Motor Sports*, 2008 WL 2095528 *2 (D. Colo. May 16, 2008) (Kane J.) (discussing contract interpretation in the summary judgment context.)  *Cf. Boston Five Cents Sav. Bank v. Department of Hous. & Urban Dev.*, 768 F.2d 5, 8 (1st Cir. 1985) (Breyer, J.) (setting out the "fact/law dichotomy in the context of this summary judgment" and noting that summary judgment is appropriate only when the language is *unambiguous* or the supporting evidence is sufficiently one-sided"); *GenCorp, Inc. v. Am. Int'l Underwriters*, 178 F.3d 804, 818 (6th Cir. 1999); *Torres Vargas v. Santiago Cummings*, 149 F.3d 29, 33 (1st Cir. 1998).

## III. BACKGROUND FACTS

The Court must view the facts in the light most favorable to Plaintiff.  *McBeth v. Himes*, 598 F.3d 708, 715 (10th Cir. 2010).  Facts relevant to the instant Motion are extensive—they can be summarized as follows:

### A.    The Parties

Plaintiff SRD is a limited liability company authorized to do business under the laws of the State of Colorado.  (ECF No. 165 at 7.)   Gary Hunter is the manager of SRD, and his job responsibilities have included managing and developing property in Colorado.  (*Id.*)  Prior to December 2004, SRD was the owner and developer of a real estate project in Douglas County, Colorado, known at various times as "Stroh Ranch,"

and/or "SunMarke." (*Id.*)

Defendants Cherry Creek South Metropolitan Districts Nos. 2-11 (collectively, the "Districts") are special districts organized pursuant to Title 32 of the Colorado Revised Statutes.  (*Id.*)  Typically, a special district provides "infrastructure and services to a specific area, with the cost being borne by the property owners and residents of the area." (ECF 165-1 at 8.)  Once formed, a special district is governed by an elected board of directors, in whom rests the authority to manage and supervise all the business and affairs of the special district.  (*Id.*)  Defendants Kurt Wolter, Kimberly Jensen, Greg McIlvain, Mark Eames, Greg Epp, and Billy Harris are all individuals who serve, or have served, as members for the Board of Directors for the Districts between January 1, 2005 to present (collectively, the "Directors").  (ECF No. 165 at 8.)

Defendant Pivotal Group, Inc.  ("PGI") is an Arizona corporation, with its principal place of business in Phoenix, Arizona.  (*Id.*)  Defendant Pivotal Parker Investments, LLC**,** a/k/a Parker Investments 2009, L.L.C.,  ("PPI") is a Delaware limited liability company authorized to do business in the State of Colorado, with its principal place of business in Scottsdale, Arizona.  Defendant Pivotal Colorado II, LLC ("PCII") is a Delaware limited liability company authorized to do business in the State of Colorado, with its principal place of business in Scottsdale, Arizona.  These defendant-entities are referred to as the "Pivotal Buyers."  Defendant North Parker Investments, LLC ("NPI") is an Arizona limited liability company authorized to do business in the State of Colorado. (*Id.*)

**B.     District 2, Prior to 2004: The Reimbursement Resolution**

As of 1999, District 2 covered a five-acre parcel of land at the northwest corner of the property that later became SunMarke.  (*Id.*)  In or about December 2003, District 2 was expanded to include additional property, bringing the total acreage of District 2 to approximately 2,918.5 acres.  (*Id.*) (*See also* ECF No. 184 at 2.)

On or about December 19, 2003, SRD and District 2 executed a Reimbursement Resolution ("Reimbursement Resolution").  The Reimbursement Resolution memorialized District 2's intent to reimburse SRD for expenditures made by SRD on behalf of District 2 for capital, operations, maintenance costs, and construction of public improvements.  (*Id.*)  The Reimbursement Resolution did not specify the amount of expenditures that SRD had made on behalf of District 2 (and for which District 2 was to repay).  Instead, the Reimbursement Resolution stated that any reimbursement of construction, operations, and maintenance costs would be subject to review and approval by the "District Accountant."  (*Id.*)  The Reimbursement Resolution stated that District 2 would use the "proceeds from bonds issued in the future, if any, or other available funds of the District" to reimburse SRD "from time to time."  (*Id.*)

**C.     Creation of Districts 3-11**

In November 2004, Districts 3-11 were created.  (ECF No. 165 at 8.)  These Districts are defined as quasi-municipal entities or Special Districts.  Following the creation of the additional Districts, the boundaries of District 2 were changed, and Districts 3-11 were arrayed over the property previously included within the boundaries of District 2, such that all property that had been excluded from District 2 was placed

within the boundaries of another district—*i.e.* the boundaries of Districts 2-11 did not overlap.  (*Id.*)  Cindi Rodriguez and Pam English became members of each of the Board of Directors for Districts 2-11, along with Gary Hunter.  (*Id.*)

In connection with the creation of Districts 2-11, the Town of Parker approved a Consolidated Service Plan ("CSP") in September 2004 that governed the activities of the Districts.  (*Id.*)  The CSP for the Districts contemplated that the financial obligations of the Districts would be payable from taxes collected on real property and included an estimate of the value of taxable property within the Districts.  (ECF 184 at 14.)  Within the Districts, there were more than 2,000 acres of taxable land as of December 2004. (*Id.*)  The estimated value of all taxable property within the Districts was then anticipated to be approximately $2,226,264,486.  (*Id.*)

The CSP defines District 3 as the Service District; and Districts 2, and 4-11 as the Financing Districts.  (*Id.* at 15.)  As such, District 3 has the authority to issue debt and advance funds to pay expenses on behalf of another District.  (*Id.*)  Under the CSP, District 3, the Service District, has limited taxing boundaries.  The Financing Districts (*i.e.,* District 2 and Districts 4-11) are responsible for producing all of the tax revenue and other revenue for payment of all of the costs of repayment of monies owed.  (*Id.*)

The CSP thus sets forth that the primary source of revenue to repay the financial obligations of the Districts (which were initially borne by the Developer) as property tax revenue.  (*Id.* at 16)  The CSP also provides for modifications to the Districts' boundaries of the District with prior approval of the Town of Parker. (*Id.*)

8

### D.    The Reimbursement Agreements

In anticipation of the sale of the SunMarke property, Hunter approached the Boards of Directors for Districts 2-11 regarding entering into agreements that would provide for the reimbursement by Districts 2-11 of expenditures that SRD had made on behalf of District 2.  (ECF No. 165 at 11.)  These steps are well summarized in the Schematic in Schedule A.

Prior to the creation of Districts 3-11 in November 2004, all of SRD's expenditures had been recorded as expenditures on behalf of District 2.  (*Id.*)

On or about November 16, 2004, Reynolds Henrie & Associates, P.C. ("Reynolds Henrie") was contacted for the purpose of spreading the costs of SRD's expenditures among all the Districts and to prepare a report reflecting these expenditures.  (ECF No. 165 at 12.)

On December 1, 2004, Reynolds Henrie tendered its final report, identified as "Schedule of Developer Advances" ("Reynolds Henrie Report").  (*Id.*)  The Reynolds Henrie Report allocated $3,507,817.65 between Districts 2-11 (the "Reimbursement Amount").  The Reynolds Henrie Report described its allocation methodology as follows: "We reviewed the schedule of market values for each district as prepared by management and calculated each district's *pro rata* share.  We applied these percentages to those expenditures which had not been charged directly to a district. District No. 2 was the only district with expenditures charged directly."  (*Id.*)  In addition, in preparing Reynolds Henrie Report, the accountant stated that he "read the Consolidated Service Plan for Districts 2-11."  (ECF No. 165-15 at 6.)

In or about December 2004, a series of reimbursement agreements were drafted between SRD and each of the Districts (collectively, the "Reimbursement Agreements," and each a "Reimbursement Agreement").  Gary Hunter received drafts of the Reimbursement Agreements on December 5, 2004.  (ECF No. 165 at 13.)  Shortly thereafter, the Boards of Directors for the Districts scheduled a meeting for December 6, 2004 at 10:30 a.m., but recessed and scheduled their meeting to reconvene on December 8, 2004.  (*Id.*)  At that meeting, each of the Directors approved the Reimbursement Agreements.  (*Id.*)  Each of the Reimbursement Agreements incorporated the Reynolds Henrie Report. (*Id.*)  The clauses relevant to each Reimbursement Agreement are addressed below.[2]

---

[2] During oral argument on February 25, 2013, Defendants' Counsel noted a distinction between the Reimbursement Agreement as applied to District 2, and the Reimbursement Agreements as applied to Districts 3-11.  Plaintiff's Counsel did not oppose this characterization, which the Court now adopts for the purposes of resolving ECF No. 165:

> The major difference between the Reimbursement Agreement for District 2 as compared to 3-11 is that there's a fall back clause in the District 2 Reimbursement Agreement that basically says that if the other districts are found to be invalid . .  that the reimbursement amount that had been allocated to the Districts in question would then revert back to District 2.

## IV. THE REIMBURSEMENT AGREEMENT: RELEVANT CLAUSES

The essential clauses from the Reimbursement Agreements are addressed as follows:

Section 1 (*Discretionary Clause*) states:

It is the District's **intent to reimburse** [Plaintiff] the Reimbursement Amount, from the proceeds of any bonds, notes, debentures, or other obligations evidencing a borrowing that the District may issue for the purpose of paying the Reimbursement Amount, when and if issued.  The issuance and timing of any **such bonds, notes, debentures, or other obligations** shall be in the **discretion** of the District, and if issued, such obligations shall contain such terms as may be determined by the District. The foregoing shall not constitute a lien . . .  upon the proceeds of any bonds . . . held by the District, except to the extent the District appropriates such **proceeds** for the specific purpose of paying the Reimbursement Amount. (*emphasis added.*)

Section 2 (*No Indebtedness Clause*) states:

It is hereby agreed and acknowledged that this Agreement evidences the District's intent to reimburse the Land Owner hereunder, but that this Agreement shall not constitute a debt or indebtedness of the District within the meaning of any constitutional or statutory provision, nor shall it constitute a multiple fiscal year financial obligation, and the making of any reimbursement hereunder shall be at all times subject to annual appropriation by the District in its absolute discretion, and shall be contingent upon the District determining, in its absolute discretion, to make such reimbursement.

Section 3 (*Cessation of Interest Clause*) states:

It is hereby agreed by the Land Owner that further interest accrual on the Reimbursement Amount shall cease as of the date of this Agreement, and that hereafter, the Reimbursement Amount shall continue to be due and owing on the terms set forth herein, but without the further accrual of interest.

Section 4 (*Covenant Clause*) states:

> In consideration of the foregoing, the District agrees that it shall not issue or incur **any bond, note, reimbursement agreement, or other debt or financial obligation** payable from any District moneys whatsoever, unless the Reimbursement Amount is paid in full either before or simultaneously with the issuance or incurrence of such bonds, notes, reimbursement agreements, or other debt or other financial obligation. (*emphasis added.*)

Section 5 (*Provision of Minutes*) states:

> Until the [Plaintiff] has been repaid the Reimbursement Amount, the District shall provide to the [Plaintiff], as soon as possible, but not later than one (1) week following their approval by the Board of Directors, minutes of each meeting of the District's Board of Directors. The minutes shall be provided by U.S. Mail or electronic mail to a person and address designated in writing by the Land Owner.

(*See generally,* ECF No. 165-16.)[3]

# V. ANALYSIS

## A.    Contract  Interpretation

Under Colorado law, the purpose of contract interpretation is to ascertain the intent of the parties by ensuring that contracts are construed "consistently with the well-established principles of interpretation." *East Ridge*., 109 P.3d at 973.  As a starting point, courts examine the contractual "terms and attempt to determine the parties intent" therein. *Id.  See also Level 3 Communications, LLC v. Liebert Corp.*, 535

---

[3] Contracts between governmental bodies and private parties are subject to hurdles not typical to private law agreements. The hurdles that contracting parties must overcome are summarized by Professor Griffith in her well cited article on *Local Government Contracts: Escaping from the Governmental/Proprietary Maze*, 75 Iowa L.Rev. 277, 290–299 (1990). *See also* Titolo, *Leasing Sovereignty: on State Infrastructure Contracts*, 47 U. Rich. L. Rev. 631 (2013); Serkin, *Public Entrenchment through Private Law*, 78 U. Chi. L. Rev. 879, 882 (2011); Super, *Rethinking Fiscal Federalism*, 118 Harv. L. Rev. 2544, 2624 (2005).  *See generally Kerr v. Hickenlooper*, 880 F. Supp. 2d 1112 (D. Colo. 2012) (where this Court addressed, *inter alia*, the more general issue of whether TABOR violates the U.S. Constitution's guarantee to republican government.)

F.3d 1146,1154 (10th Cir. 2008); *Pirkey v. Hospital Corporation of America*, 483 F.Supp. 770 (D. Colo. 1980).

When construing a contract, courts must *not* "view clauses or phrases in isolation." *East Ridge*., 109 P.3d at 974-75.  This principle guards against a reading of the contract that would "yield an absurd result"—and run inconsistent with the purpose of the contract.  *Atmel Corp. v Vitesse Semiconductor Corp.*, 30 P.3d 789, 793 (Colo. App. 2001).  Courts must examine the contract as a whole and attempt to determine the intent by reference to *all* of the contract's terms and provisions.  *Liebert*., 535 F.3d at 1154; *East Ridge*., 109 P.3d at 973;

Whether a written contract is ambiguous is a question of law.  *Id.*  When a contractual term "unambiguously resolves the parties' dispute, the interpreting court's task is over" because "in the absence of an ambiguity a written contract cannot be varied by extrinsic evidence."  *Id.*   A contract is ambiguous "if it is fairly susceptible" to more than one interpretation. *Id.  See also East Ridge*, 109 P.3d at 974-75.  In determining whether an ambiguity exists, the court may look to the meaning of words with "reference to all contractual provisions and the nature of the transaction which forms the contract's subject matter." *In re Marriage of Thompson*, 802 P.2d 1189 (Colo. App. 1990);  *May v. United States*, 756 P.2d 362, 369 (Colo. 1998) (*en banc*).

As here, and when ambiguity does exist, the meaning of a term is generally an issue of fact that may be determined by extrinsic evidence pertinent to the transaction—including the parties' conduct under the agreement and their conduct before the controversy arose.  *Liebert*., 535 F.3d at 1154.

In order to determine whether the contract is ambiguous "extrinsic evidence may

also be *conditionally* admitted" in the context of a motion for summary judgment.  *East*

*Ridge.*, 109 P.3d at 974;  *Lobato v. Taylor*, 71 P.3d 938, 947 (Colo.2002) (*en banc*).

Specifically, under Colorado law, extrinsic evidence may be relied upon in two different

forms.  First, a court can look to extrinsic evidence that may reveal ambiguities by

conditionally admitting evidence for the purposes of determining an ambiguity.  Second,

extrinsic evidence may be examined if a document is ambiguous on its face—*i.e.*,

extrinsic evidence is required to ascertain the intent, expectations of the parties and the

circumstances that surrounded the formation of the contracts.  *Id.*

      1.   <u>Defendants' Interpretation of the Covenant Clause</u>

To succeed on summary judgment, Defendants must show that the

Reimbursement Agreements are unambiguous as a matter of law.  Defendants must

also demonstrate that the agreements can be construed without need for extrinsic

evidence going to the parties' intent.  *Beavert*, 963 F.2d 1342, 1345-6.

The central dispute regarding interpretation lies with the Covenant Clause.  That

Clause provides:

> It was not uncommon for agreements of this nature, reimbursement
> type documents between developers and metro-districts as we have here,
> to effectively be this kind of soft language that cushions [these documents
> from certain prohibitions ] In consideration of the foregoing, the District
> agrees that it shall not issue or incur any bond, note, reimbursement
> agreement, or other debt or financial obligation payable from any District
> moneys whatsoever, unless the Reimbursement Amount is paid in full
> either before or simultaneously with the issuance or incurrence of such
> bonds, notes, reimbursement agreements, or other debt or other financial
> obligation.
> (ECF No. 165-16 at 2.)

To support their preferred position, Defendants contend that the phrase—"any

financial obligation—should be construed restrictively because the Covenant Clause is

"written in absolute, uncompromising terms, that leave no room for exceptions." (ECF No. 165 at 22.)  They contend that the Covenant Clause "paralyzes the Districts and prevents them from performing any governmental functions" because it "prohibits the Districts from incurring any financial obligation payable from any District moneys whatsoever." (*Id.*)  This interpretation, Defendants submit, means that the Districts: (1) cannot have employees, (2) cannot buy paper, and (3) cannot maintain offices, among other things.  (*Id.*)  Defendants contend that the Districts are restricted in both their operational and discretionary expenses.  (*Id.*)

For the reasons that follow, Defendants' textual approach to the phrase "any financial obligation" is misplaced; ever more so when the phrase is viewed in light of the entire agreement.  *May,* 756 P.2d at 369.

First, Defendants' interpretation is devoid of context.  *Id.*  It takes a literal approach and fails to appreciate a central canon of interpretation that a court must construe the entire agreement—not just words in isolation.  *Id.*  Were the Court to adopt Defendants' interpretation, it would mean that the Districts cannot purchase paper, nor hire employees.  In other words, the Districts could not operate, as there are no resources to do so because their hands are effectively tied by the Covenant Clause.  This interpretation is absurd.  *Atmel.*, 30 P.3d at 793.  Defendants' interpretation seeks to slice three words out of the entire agreement, and then rely on those words as the predicate for the parties' intent.  Contracts are not interpreted this way.  *May,* 756 P.2d at 369.

The fact that restrictions on the 'purchase of paper' were *not* referred to by Defendants in their supplemental brief is also telling.  It suggests that Defendants

became wary of its rigid reading of the Covenant Clause—and then sought to place distance between it and a more reasonable reading of the clause based on context.  But Defendants cannot have it both ways.  Either Defendants' interpretation is absurd (and rejected), or Defendants have distanced themselves from their initial interpretation of the Covenant Clause.  Either of these alternatives would suggest that the Covenant Clause is subject to a reasonable interpretation beyond that offered by Defendants.  As such, and to the extent that Defendants' Motion for Summary Judgement is based on either of these alternatives, the Motion is denied.  *Liebert*, 535 F.3d at 1154  (A contract is ambiguous "if it is fairly susceptible to more than one interpretation.")[4]

Second, Defendants' interpretation fails to deal with the inconsistency between the Covenant Clause and Discretionary Clause.

The inconsistency between the Covenant Clause and the Discretionary Clause lies in the tension that the latter *purportedly* provides the Districts with discretion to

_____

[4]  The Court further observes that Defendants' interpretation was submitted in a way that sought to heighten the chances of the Reimbursement Agreements being invalidated under the Reserved Powers Doctrine.  Reference to the Districts (in)ability to 'purchase paper', because of the Covenant Clause, is illustrative.  The Court rejects this approach: it draws parallels with the pushing of a square peg through the proverbial round hole.

It also runs afoul of the long-standing principle that a contract should be construed to preserve its validity.  *See Hobbs v. McLean*, 117 U.S. 567, 576 (1886) ("[W]here a contract is fairly open to two constructions—one of which would be lawful, and the other unlawful—the former must be adopted.")  See also, *Northrop Grumman Computing Sys., Inc. v. United States*, 93 Fed.Cl. 144, 150 (2010) (stating that an interpretation of the contract that would contravene a "statute would be disfavored"); *Cray Research v. United States*, 44 Fed.Cl. 327, 333 (1999) (citing *Hobbs*);  *Cooper v. Nth Pac. Railroad Co.*, 212 Fed. 533 (1914). ("[I]t is also familiar law that if contracts be fairly open to two constructions, one lawful and one unlawful, the former is to be preferred");  *Millen v. Potter*, 190 Mich. 262, 273, 157 N.W. 101, 105 (1916) *See also U.S. Trust Co. of New York v. New Jersey*, 431 U.S. 1, 23 (1977) (addressing the Reserved Powers Doctrine).  It is no surprise that several of the above cases are drawn from the Court of Federal Claims that address cases involving public/private contracts (similar to the one in suit.)

issue bonds without restriction; while the former *purportedly* restricts this same discretion to the extent that the Districts can only issue bonds after Plaintiff is *first* reimbursed.  The Court finds that this inconsistency provides a hurdle for Defendants' Motion because it presents an ambiguity that is difficult to reconcile *without* more evidence of the parties' intent.  The ambiguity, on the face of the document, is such that it can only lead to the conclusion that Defendants' Motion for Summary Judgement must be denied as a matter of law.  *Liebert.*, 535 F.3d at 1154.

This conclusion is further fortified by what was said at oral argument.  When confronted with the inconsistency during oral argument, Defendants' Counsel sought to have it reconciled by reading the Discretionary Clause to mean that it provided the Districts with "unfettered discretion" to reimburse Plaintiff (or not).  When asked by the Court whether this meant that Plaintiff might possibly "never be paid off", Defendants' counsel responded: *"Effectively, yes. Your Honor."*  (emphasis added.)

Notwithstanding the plain language of the Discretionary Clause that provides that it is the "District's intent to reimburse"—let alone the lingering good faith obligations that exist in all commercial contracts—Defendants' counsel explained the position by reference to the fact that Reimbursement Agreements were intentionally drafted with discretionary language in mind.  That is, counsel said that the discretionary language (the so-called "soft language") was intentionally used to circumvent "certain prohibitions, constitutional and statutory, in Colorado law."   Among other examples, TABOR was referred to, which is further exemplified by the following submission by counsel:

> It was not uncommon for agreements of this nature, reimbursement
> type documents between developers and metro-districts as we have here,
> to effectively be this kind of soft language that cushions [these documents

17

from certain prohibitions].

But in making this submission, Defendants tacitly concede that the Court must examine statutory and constitutional prohibitions so as to properly construe the Reimbursement Agreements.  Because of this, it follows that the Court (or jury) must then consider how the parties objectively read these prohibitions—and drafted around them–in order to "cushion" the language and ensure the validity of the Reimbursement Agreements.  This begs the question: how can these enquiries be undertaken without looking to extrinsic evidence?  Further, how can the Court, in a summary judgment context, assess materials and evidence that exists outside the four corners of a contract?  These questions must be answered in the negative. Clearly, extrinsic evidence is required. *Liebert.*, 535 F.3d at 1154. *See also Residential Mktg. Group v. Granite Inv. Group*, 933 F.2d 546, 548 (7th Cir. 1991) (Posner J.)  (addressing the "eternal tug of war" between giving one party to a contract a right to testify to what was meant by the words on the one hand; and depriving the opposing party the protection of the written contract on the other.)

Accordingly, because extrinsic evidence is required to construe the Reimbursement Agreements, the Court must deny the Motion since Defendants' interpretation cannot be adopted as a matter of law. *See Residential Mktg.*,933 F.2d 546, 548 (stating that extrinsic evidence may be relied upon as a "tie-breaker" to "disambiguate the contract.")[5]

---

[5] Defendants' Counsel submitted that Section 2 of the Reimbursement Agreement ("No Indebtedness Clause") supports a reading that afforded the Districts unfettered discretion to reimburse. That clause provides:

Third, Defendants' interpretation runs contrary to interpretive principle: *noscitur a sociis*—that is, a word is known by the company it keeps.  *Gustafson v. Alloyd Co.*, 513 U.S. 561, 575, (1995).  The principle finds its origins in commonsense and a contextual reading of a legal document.  *Alioto v. Hoiles*, 341 F. App'x 433, 440. n12 (10th Cir. 2009) (stating that *noscitur a sociis* is "antiquated way of saying what common sense

─────────────────────

It is hereby agreed that . . . the District's intent [is] to reimburse the [Plaintiff], but that this Agreement shall not constitute a debt or indebtedness of the District within the meaning of any constitutional or statutory provision . . . and the making of any reimbursement hereunder shall be at all times subject to annual appropriation by the District in its absolute discretion, and shall be contingent upon the District determining, in its absolute discretion, to make such reimbursement.

Despite reliance on this clause, and the first sentence reiterating an *intent to reimburse*, Defendants acknowledged that Section 2 was also drafted with language to circumvent prohibitions under Colorado law (including TABOR).  But to construe Section 2, the Court must review those statutes and doctrines in order to determine the meaning of the language in this clause, among other things. These materials are extrinsic to the Reimbursement Agreements. Reference to the prohibitions thus opens the door to extrinsic evidence to clarify the ambiguity; and, at the same time, forecloses any chance of success for Defendants on summary judgment. *East Ridge.*, 109 P.3d at 974.  Three further points are worth noting:

(1) While the Court acknowledges that the Section 2 expressly states "absolute discretion to . . .  reimburse", this same language is not found in the Discretionary Clause (Section 1).  It begs the question: why did the parties not put the word "absolute" in the Discretionary Clause itself (seemingly a more apt location for its usage based on the face of the document).  This further necessitates the need for extrinsic evidence.

(2) The Covenant Clause is also inconsistent with the Section 2 in so far that it provides the trigger for first priority payment and limits the issuance of bonds, *inter alia*, by ensuring that the Plaintiff is reimbursed first before such issuance.  This is at odds with the No Indebtedness Clause because it provides *some* limits to the argument that the Districts had unfettered discretion to reimburse SRD.

(3) The constraints on the Districts's discretion (albeit limited) is reflected in Section 3 (Cessation of Interest Clause).  On a plain reading of this clause, and without factual input from extrinsic evidence—particularly in circumstances where the parties intended the *quid pro quo* of the agreement be the cessation of interest for first priority reimbursement payment—it is difficult for the Court to construe the Reimbursement Agreement as a matter of law.  Section 3 says one thing; Section 2 purports to say another.  Clearly, extrinsic evidence is required as a tie-breaker. *See Residential Mktg.*, 933 F.2d at 548 (referring to the need for extrinsic evidence as a "tie-breaker" to "disambiguate the contract.")

tells us to be true.")

While not always taken into account, *noscitur a sociis* is applicable to "all written instruments" where any word or phrase is doubtful; and the "meaning of a term may be . . . restrained by reference" to the words that surround it. *Virginia v. Tennessee*, 148 U.S. 503, 519 (1893). *ESI, Inc. v. Coastal Corp.*, 61 F.Supp.2d 35, 75 (S.D.N.Y. 1999) (stating that "general words are construed to embrace only objects similar in nature to those objects enumerated by the *preceding* specific words."); *Harris v. Allstate Ins. Co.*, 309 N.Y. 72, 76-77 (1955) (applying interpretive principle to interpret an automobile insurance policy). *See also Corbin on Contracts*, § 24.2 (1962).

Here, the operative phrase in the Covenant Clause is "any financial obligation." When asked by the Court to address whether the operative phrase should be read in conformity with the specific examples listed in the Covenant Clause, Defendants' counsel merely addressed those words that *followed* the operative phrase—not the words that *preceded* it. These words include: "bond, note, reimbursement agreement, or other debt." With the exception of the phrase 'other debt', the remaining words in the Covenant Clause provide clear examples of the types of financial obligations that the Districts could enter into, which would trigger reimbursement. That is, the Court finds that the words that precede the operative phrase tend to restrain its meaning and suggest that the Covenant Clause should be read to mean financial obligations akin to *bonds, notes and reimbursement agreements*. *ESI, Inc.*, 61 F.Supp.2d at 75 (holding that words grouped in a list should be given related meaning.)[6]

---

[6] In *ESI.*, 61 F.Supp.2d at 75—a case with similar contractual language to that found in this case—the court said: "According to the *noscitur a sociis* rule of contract construction (or its

This seems a more sensible reading of the Covenant Clause. It also points against Defendants' preferred interpretation; and points towards a finding that another reasonable interpretation of the Covenant Clause must exist.  *East Ridge.*, 109 P.3d at 973 (stating that if a contract is determined to be ambiguous because it is fairly susceptible to two interpretations, the meaning of its terms are generally an issue of fact to be determined in the "same manner as other disputed factual issues.")

Accordingly, and to the extent that Defendants' Motion is founded on a broad interpretation of the Covenant Clause, the Motion for Summary Judgment is denied.

### 2.    Plaintiff's Interpretation of the Covenant Clause

The Court, in addition, finds that a review of Plaintiff's preferred interpretation confirms the following: (1) that Defendants' interpretation should be rejected, (2) that there is, at a minimum, an ambiguity in the Reimbursement Agreements as a matter of law because Plaintiff's position provides a reasonable interpretation of the clauses that differs to that of Defendants', and (3) that summary judgment should be denied. *Liebert.*, 535 F.3d at 1154.  *See also GenCorp, Inc.* 178 F.3d 819 (6th Cir. 1999) (discussing ambiguity in the "in the summary judgment context", and noting that the "nonmoving party must present" a theory to support a "reasonable interpretation that differs from the moving party.")   Indeed, addressing Plaintiff's interpretation in the summary judgment context squares with the concept of "legal ambiguity", which presupposes two or more reasonable interpretations.  *Id.  See also Boston Five Cents.*, 768 F.2d at 8 (Breyer J.); *Pirkey.*, 483 F.Supp. at 770 (stating that contracts should be

---

cousin *ejusdem generis* ), the phrase 'any other obligations or liabilities, "should be interpreted as referring to obligations or liabilities similar in nature to Trigen's obligation to reimburse IEC."

construed "so as to effectuate the parties' intent.")

Here, Plaintiff's interpretation is pitched at two different levels of generality.  At one level, Plaintiff rebuts Defendants' position that the Districts have unfettered discretion whether to reimburse Plaintiff SRD (if at all).  Plaintiff relies on *East Ridge.*, 109 P.3d at 974  (stating that once "an ambiguity has been determined to exist...courts must then give effect to the intention of the parties by considering competent evidence bearing upon the construction given to the instrument.")

At a more specific level—and with regard to the Covenant Clause—Plaintiff interprets that clause to mean that SRD is entitled to "priority repayment when the Districts incurred new debt for future undertakings (for *e.g.*, when new bonds were issued or developer reimbursement agreements were entered into)."  (ECF No. 227 at 1-2.)  Plaintiff contends that the Covenant Clause "does not affect payment of the Districts' operating expenses in the ordinary course, because such expenses are ongoing costs for basic statutory compliance, rather than new financial obligations." (*Id.*)  This interpretation, *inter alia,* was offered to reconcile the Covenant Clause and the Discretionary Clause.

Turning to the evidence to support Plaintiff's interpretation, Plaintiff first contends that the parties' intent to reimburse is reflected in the very title of the contracts, which is also supported by the language of the clauses therein.  The Court agrees.  The contracts are titled: "Reimbursement Agreements." (ECF No. 165-16.)  The title speaks for itself: if the parties did not wish to provide for reimbursement, why would the title say as much?  The title is also complemented by the language in the Discretionary Clause and the No Indebtedness Clause.  The opening sentence in each clause states: "*It is*

*the Districts Intent to reimburse . . .*" (*Id.* at 3, emphasis added).  Section 5 of the Reimbursement Agreement also states: "Until the [Plaintiff] has been repaid the Reimbursement Amount, the District shall provide . . . the minutes of each meeting." (*Id.*)  Again, this clause evinces an intent that Plaintiff would be reimbursed and that payment was *not* left to the unfettered discretion of the Districts (or those who controlled them).  *Liebert.*, 535 F.3d at 1154.

Second, the parties intent is further demonstrated in the Cessation of Interest Clause.  That clause provides that Plaintiff agreed to cease interest on the advance of $3.5mm under the Reimbursement Resolution in return for first priority payment when the Districts, *inter alia*, issued bonds.  Defendants did not dispute this reading of the clause. In effect, it was the *quid pro quo* of each agreement.  It provides objective *indicia* of the parties' intent; an intent which runs contrary to Defendants' position that reimbursement was left to the unilateral discretionary determination of the Defendant Districts.

Third**,** and with respect to Plaintiff's more specific interpretation—that the Covenant Clause and Discretionary Clause can be reconciled based on the plain language of the Reimbursement Agreements—the Court finds Plaintiff's argument less persuasive.  The reasoning is similar (if not the same) to that stated earlier regarding the inconsistency between the Discretionary Clause and Covenant Clause.

While the Court is not persuaded by Plaintiff's primary position because of the inconsistency, the Court agrees with Plaintiff's alternate position that the inconsistency, at a minimum, "implies an ambiguity." (ECF No. 184 at 28.)  This ambiguity also calls for a denial of Defendants' Motion for Summary Judgment because it compels the Court

to look to extrinsic evidence.  Determination of such evidence creates factual disputes for jury assessment.  Examples of such evidence include:  (1) customs and standards in the industry, and (2) the Consolidated Service Agreement (*i.e.*, the CSP), among others.

With respect to (1), Defendants tacitly conceded in oral argument that industry standards play a significant role in the drafting of agreements to reimburse property developers (such as SRD). This has been addressed earlier.  Such evidence, coupled with the context on how (and why) the Reimbursement Agreements have been drafted, to circumvent Colorado law prohibitions  will be critical to clarifying the tension between the Covenant Clause and the Discretionary Clause.

With respect to (2), Plaintiff placed much emphasis on the importance of the CSP.  Based on the facts in the record, the CSP was critical to the formation of the Districts.  (ECF 184 at 6-14.)  It contemplates the financial obligations of the Districts.  *Id.*  The CSP determined how much each District would owe SRD, and how those amounts could be paid on a *pro rata* basis through taxation.  (ECF No. 165-15 at 6; ECF No. 227 at 5-6.)  This is summarized in the Reynolds Henrie Report, which provides the break-down of the Reimbursement Amounts.  (ECF No. 165-15 at 7.)

Contrary to Defendants' position, the CSP is evidence critical to interpreting the Covenant Clause and the Discretionary Clause.  Because of this, the Court finds that review of the CSP is best left for jury determination, which precludes disposition of the instant Motion as a matter of law. *Anderson*, 477 U.S. at 248; *Liebert.,* 535 F.3d at 1154 (relying on *East Ridge,* 109 P.3d at 974-75) (holding that issues of fact may be determined by extrinsic evidence—including the parties' conduct before the controversy

arose.) [7]

## B.    Implied Covenant of Good Faith and Extrinsic Evidence

Plaintiff seeks to impose an implied obligation or covenant of good faith and fair

dealing upon Defendants in the course of the discharge of their duties under the

Reimbursement Agreements.   A duty of good faith is used "to effectuate the intentions

of the parties or to honor their reasonable expectations." *Amoco Oil Co. v. Ervin*, 908

P.2d 493, 498 (Colo. 1995).  Cases involving good faith obligations typically involve

"arm's-length transactions, often between sophisticated business persons."  *Id.*  The

relative strength of the party exercising discretion arises from an agreement of the

parties to confer control of a contract term on that party.  *Id.* The dependent party is

then is left to the good faith of the party in control.  *Id.*  The existence of some level of

discretion in the contract thus provides the predicate for an implied covenant of good

faith and fair dealing.  *Id.*

Although the purpose of the good faith doctrine is to protect the "reasonable

expectations of the parties by implying terms into the agreement"—and that good faith is

"generally applicable to all contract provisions"—determining the exact parameters of

the obligation in the summary judgment context is not without difficulty.  *See Big Horn*

*Coal Co. v. Commonwealth Edison Co.*, 852 F.2d 1259, 1267 (10th Cir. 1988).  To this

end, the Court may review extrinsic evidence to assist in determining the scope and

---

[7]  During oral argument Defendants' counsel hinted that the Court could only rely upon extrinsic evidence if there was an ambiguity from the "face of the contract itself."  That position is an incorrect statement of the law in Colorado, as extrinsic evidence can be "conditionally used" to determine ambiguity, which supports the holding here given the complex evidence outside that of the four corners of the contracts in suit.  *See East Ridge* 109 P.3d at 974.

content of good faith obligations.  *Id* at 1267 (holding that the trial court did not "abuse

its discretion in allowing the Coal Companies to present oversupply and other good faith

evidence'); *Tri-State Generation & Transmission Ass'n v. Shoshone River Power, Inc.*,

874 F.2d 1346, 1355 (10th Cir. 1989) (stating in the context of good faith, that

"whenever a contract cannot be carried out in the way it was obviously *expected* that it

would be carried out . . . a promise to do that act must be implied" ); *Diamond Alkali Co.*

*v. P.C. Tomson & Co.*, 35 F.2d 117, 119 (3d Cir.1929) (same); *see Paccon, Inc. v.*

*United States*, 399 F.2d 162, 170-71 & n.11 (Ct. Cl. 1968)  (stating that parol evidence

"spell(s) out" and "triggers . . . the latent obligation, implicit in a written contract.")

Here, Plaintiff argues that an implied covenant arises from the discretionary

language in Section 1 of the Reimbursement Agreements (the Discretionary Clause).

Plaintiff points to the language in Section 1 to support its position.  The section states:

> It is the District's intent to reimburse . . .  from the proceeds of any
> bonds . . .  The issuance and timing of any such bonds . . . shall be in the
> discretion of the District, and if issued, such obligations shall contain such
> terms as may be determined by the District. . ."

Plaintiff argues that Districts 4-11 breached their duty of good faith and fair

dealing by allowing Districts 2 and 3 to enter into Reimbursement Agreements with

Pivotal Buyers and pledging their limited revenue to others both before repaying SRD.

Plaintiff asserts that a duty of good faith is particularly applicable in dealing with

government entities; and that a duty exists in this case because "the public has a right

to expect honesty, good faith and fair dealing from its government [entities]." *City of*

*Torrington v. AFSCME Council,* 4 2002 WL 1840808, 11 (Conn. Sup. 2002).

To counter, Defendants assert that the Court should not impose an implied

covenant of good faith in this case because the Reimbursement Agreements provide

unfettered discretion to the Defendant Districts with regard to whether, if at all, the Plaintiff would ever be reimbursed. *Cf. Amoco*, 908 P.2d at 498 (*citing Big Horn*, 852 F.2d 1267). This argument has been heard before. It lacks merit because of the internal inconsistencies, *inter alia*, between the Discretionary Clause and the Covenant Clause, making for ambiguity.

Because of this ambiguity, it is impossible to tell objectively from any Reimbursement Agreement when it was breached without further context going to the parties' intent (and reasonable expectations). Put simply, and in the absence of extrinsic evidence, it is difficult in the summary judgment context to know the precise scope of not only the Discretionary Clause, but the good faith obligations that attach to it. Viewing the Discretionary Clause from this perspective, it would seem appropriate for the Court to permit extrinsic evidence to show the "why", "when", "how", and in "what manner" reimbursement would be made by the Districts to SRD—*i.e.*, the precise triggers for when payment would 'kick in'. These are matters for jury trial.

Accordingly, the Court finds that extrinsic evidence is required to inform the parties' respective good faith obligations. This forecloses the possibility that this issue can be summarily resolved as a matter of law. As such, Defendants' Motion for Summary Judgment is also denied with regard to the existence, parameters and requirements of an implied covenant of good faith and fair dealing in the context of the facts of this case. *See Adler*, 144 F.3d at 670. *See also Big Horn*, 852 F.2d at 1267 (holding that the purpose of the good faith doctrine is to "protect the reasonable expectations of the parties" and allowing "good faith evidence" to determine the

obligations.) [8] [9] [10]

# VI. CONCLUSION

Based on the foregoing reasons, the Court DENIES Defendants' Motion for Summary Judgment (ECF No. 165) to the extent that it applies to the interpretation of the Reimbursement Agreements and to the related issue of the implied covenant of good faith and fair dealing.  The Court makes no findings with respect to the Reserved Powers Doctrine; nor on the issues related to notice and breach of contract as submitted in Defendants' Motion.

---

[8] *See Paccon, Inc. v. United States*, 399 F.2d 162, 170-71 & n.11 (Ct. Cl. 1968).  The *Paccon* case is useful. Like this case, it is illustrative of a government entity making pre-contractual representations which provide the basis for an implied term. And while the *Paccon* court did not expressly state the implied covenant was one of good faith *per se*, the *indicia* of the facts suggest as much. The case thus provides some guidance. *See also* ECF No. 184 at 12.

[9]  In *Big Horn*, 852 F.2d 1259, 1267—a case that has some parallels with the instant one– the following passage from the Tenth Circuit is instructive:  "Because the term is *ambiguous*, it is impossible to determine with certainty whether the parties *expected* that section 3.01 would be exercised . . . Because of this uncertainty, it is impossible to tell objectively if the express condition was met, unlike in the case where the express condition requires only a written notice within a certain time. Because "environmental reasons" is *not* defined, the term may be viewed as a *motivational term—i.e.*, that section 3.01 can be invoked for environmental reasons. Viewing the term from this perspective, we conclude that it was appropriate for the district court to allow *extrinsic evidence* . . . and the jury was properly allowed to determine if Edison had a valid reason for invoking section 3.01. We cannot say the trial court abused its discretion in allowing the Coal Companies to present oversupply and *other good faith evidence*." (emphasis added.)

[10]  Indeed, some commentators have said that like justice, good faith is a "vague and shifting concept."  They also say that because a concept cannot be "formalized into a tight matrix" does not make it wrong.  Rather, it just makes it "consistent with how humans behave—and *should* behave." *See Corbin on Contracts* § 26.8 (1963).  The passage is apt in this case.

Dated this 18th day of March, 2013.

BY THE COURT:

William J. Martínez
United States District Judge

**SCHEDULE A (SCHEMATIC OF CONTRACT CLAIMS)**



**Plaintiff**
**Stroh Ranch Development, LLC ("SRD")**

**Step #1**
2003: SRD loans money in exchange for Reimbursement Resolution by Cherry Creek South Metro District ("CCSMD") 2  (incl. interest)

**Defendant CCSMD 2**

**Defendants CCSMDs 3-11**

**Step #2**
Consolidated Service Plan ("CSP") forms 10 Metro Districts under unified financial plan, CCSMD 3 to act as agent

**Step #3**
2004: SRD enters Purchase & Sale Agreement ("PSA") with Pivotal Group, Inc. ("PGI") to sell the Improved Property

**Defendant PGI**

**Step #4**
12/8/04: SRD and CCSMDs 2-11 enter into Reimbursement Agreements giving SRD debt 1st priority for a total of $3,507,817.65 in reimbursement to be recouped through assessments over entire Property.

**CCSMD 2-11**

**CCSMD 3**

**CCSMD 2**

**Step #5**
12/8/04: PGI assigns PSA to related sub-entities (PPI/PCII) under same management. SRD expressly reserves Reimbursement Receivable.

**Defendant Pivotal Parker Investments, LLC ("PPI")**

Pivotal Colorado, LLC ("PC") - Affiliate of PGI/ Manager of PPI/PCII

**Defendant Pivotal Colorado II, LLC ("PCII")**

PCII transfers property to North Parker Investments, LLC ("NPI") (same ownership)

**Defendant NPI**

**Step #6**
2005: Pivotal entities change CCSMD Directors

**Step #7**
2005: New Directors improperly exclude land from CCSMD Boundaries creating 35 acre stack; 2006: New Directors approve agreements diverting payment from collective Property.

**Step #8**
2006: CCSMD 3 and PPI ignore SRD priority and enter into Public Facilities Funding Agreement

**Step #9**
2006: CCSMD 3 and PPI ignore SRD priority and enter into Operation Funding Agreement

**Step #10**
2006: CCSMD 3 and PPI ignore SRD priority and enter Construction & Acquisition Agreement

**Step #11**
2009: CCSMD 2 & CCSMD 3 ignore SRD priority and enter into District Operating Funding Agreement; Revenue from CCSMD 2 to be diverted to ownership/maintenance of recreation center in contravention of CSP

**Step #12**
2009: New Directors change Metro District Boundaries and move stack to NPI land

**Step #13**
CCSMDs convert to inactive status

CONTRACT CLAIMS